**AFFIDAVIT IN SUPPORT OF APPLICATION FOR A CRIMINAL COMPLAINT**

I, Galen Doud, being sworn, state:

### Introduction and Agent Background

1.      I have been employed as a special agent with the Drug Enforcement Administration ("DEA") since May 2017, and am currently assigned to DEA's Manchester, New Hampshire, District Office.  My primary duties as a DEA Special Agent include investigating federal crimes and violations of the Controlled Substances Act at the local, national, and international level.

2.      While attending the DEA Training Academy, I received training on a multitude of topics pertaining to drug investigations.  I have been involved in numerous drug investigations.  I have also participated in both physical and electronic surveillances, the purchase of illegal drugs, enforcement operations including the execution of both search warrants and arrest warrants, and interviews of sources of information, confidential sources, drug traffickers, and drug trafficking organizations.  I am also a member of DEA's Special Response Team as well as DEA's Clandestine Laboratory Enforcement Team.

3.      Prior to being employed as a DEA Special Agent, I was employed as a full-time police officer with the City of Nashua, New Hampshire Police Department for approximately four and one half years.  I made several hundred arrests and initiated, conducted, and assisted in even more criminal investigations, many of which involved drug violations.  I worked as a police officer in a uniformed and plain-clothed capacity, and debriefed numerous defendants and cultivated many sources of information and confidential sources pertaining to drug trafficking organizations.  I have also attended multiple trainings about drug related investigations, and relevant topics associated with drug investigations.  I have a Bachelor of Science degree in Criminal Justice from Northeastern University.

4.      Based on my training, education, and experience, I am familiar with the manner and means commonly employed by drug traffickers and drug trafficking organizations to conduct their illegal activities, including purchasing, manufacturing, storing, and distributing controlled substances, the laundering of illegal proceeds, and the efforts of persons involved in such activities to avoid detection by law enforcement.  I am also familiar with the terminology and slang commonly employed by drug traffickers.  I have observed and examined fentanyl and controlled substances.  I am aware of the prices commonly charged on the street for these substances, the method of packaging, and the jargon used in the drug trade.

5.      Through my training and experience, I am familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs.  Through my training, education, and experience, I have become familiar with the manner in which drug distribution organizations conduct their illegal activities, including purchasing, manufacturing, storing, and distributing narcotics, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement. Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  Further, I know that individuals who distribute narcotics often utilize cellular telephones, and the text messaging capability included within their cellular telephones, as a method by which to arrange narcotics transactions.  I also know that individuals involved in the distribution of controlled substances frequently speak in code, either during conversations or while using the text messaging function within their cellular telephone, as a means with which to avoid detection and apprehension by law enforcement.

2

**Purpose of the Affidavit**

6.     I submit this affidavit in support of the following:

        a.     A criminal complaint charging Angel David Aybar CARMONA, a/k/a

        "Pinki," with distribution of and possession with intent to distribute 40

        grams or more of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and

        (b)(1)(B)(vi) (the "Charged Offense").

7.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show that there is probable cause to believe that CARMONA committed the Charged Offense.

**Probable Cause**

*Investigation Initiation*

8.     On December 2, 2020, at approximately 7:50 p.m., a law enforcement investigator acting in an undercover capacity ("UC-1") was parked in his vehicle near the intersection of Melrose and Water Streets in Lawrence, Massachusetts.  A Hispanic man wearing a black leather jacket approached UC-1's vehicle, walked past the vehicle several times, and eventually approached the front, passenger window.[1]  Once at the car window, UC-1 lowered the window and CARMONA said "sample."  Based on my experience and training, I know "sample" to mean a sample of drugs, usually meaning fentanyl in the greater Lawrence area.  CARMONA then dropped a small plastic bag with a substance wrapped in paper inside the plastic bag.  On the paper in the bag, a partial phone number was visible.  Based on my experience and training, it is

_____

[1] This man was later identified as CARMONA after his December 8, 2020 arrest described below.  I will refer to him as CARMONA for the remainder of this affidavit.

common practice in Lawrence for drug dealers to provide drug samples with their phone numbers to potential customers. Using words and hand gestures, CARMONA indicated that he wanted UC-1 to take his phone number. CARMONA indicated his name was "Pinki" and told UC-1 to call him. CARMONA gave UC-1 his cell phone and UC-1 called a phone number used by UC-1 from CARMONA's cell phone. CARMONA's cell phone number was (978) 802-9811 (the "Carmona Phone"). Based on my training and experience, I understood CARMONA to be providing UC-1 with his cell phone number so that UC-1 could call CARMONA to arrange for the sale of narcotics.

9.      UC-1 transported the sample of suspected drugs to a law enforcement facility where it was logged into evidence. The sample was not field tested for officer safety. Based on my training, experience, method of distribution, and packaging of the suspected drugs, I believe the drugs to be fentanyl. The suspected drugs will be sent to the DEA laboratory for testing.

10.     Beginning on December 2, 2020, UC-1 began exchanging text messages with CARMONA at the Carmona Phone for the purpose of arranging a drug transaction. All text message communications between UC-1 and the Carmona Phone were conducted in English and have been preserved. CARMONA stated, "From now on write to me for what you need." UC-1 responded, "What do you have?" CARMONA responded, "I have brown and it is very good I know you will like it and your friend." CARMONA continued, "I have brown[.] It is the best and I will accommodate the prices[.]" Based on my training and experience, I know that "brown" is street slang for fentanyl and understood CARMONA to be offering to sell UC-1 fentanyl.

11.     The text exchange continued and UC-1 and CARMONA negotiated the price for a finger, or 10 grams, of fentanyl. CARMONA agreed to a price: "I can give it to you at 180 and

4

I'm accommodating you here they sell them at 200[.]"  After additional negotiation, CARMONA stated, "[Y]ou tell me if we can negotiate, I have 12 fingers, I can give it to you at once with me, you will not have to wait long[.]"  Based on my experience and training, I believe CARMONA agreed to sell UC-1 12 fingers, or 120 grams, of fentanyl for $180 per finger.

12.    Between December 2, 2020 and December 8, 2020, UC-1 and CARMONA, using the Carmona Phone, continued to exchange text messages regarding the drug deal.  They eventually agreed to a final price of $175 per finger.

*On December 8, 2020, CARMONA Supplied UC-1*
*with Approximately 120 Grams of Suspected Fentanyl.*

13.    On December 8, 2020, at approximately 12:51 p.m., UC-1 and CARMONA, using the Carmona Phone, exchanged text messages to finalize their arrangements for the drug sale.  In lightly coded language, UC-1 asked CARMONA if he was ready to complete the sale. CARMONA responded, "Good friend, I'm ready too, I already have my fingers in the bag ready for you[.]"  Based on my training and experience, I believe CARMONA was referring to the 12 fingers of fentanyl he had agreed to sell to UC-1.  UC-1 and CARMONA eventually agreed to meet at the Family Dollar at 700 Essex Street in Lawrence to complete the drug sale.

14.    On December 8, 2020, at approximately 1:00 p.m., UC-1 and another investigator acting in an undercover capacity ("UC-2") met with other investigators at a predetermined location.  At the location, investigators outfitted UC-2 with an audio / video recording device and provided UC-2 with $2,100 of sham money to pay for the drugs.  Investigators then surveilled UC-1 and UC-2 as they drove to the Family Dollar.

15.    At approximately 1:57 p.m., UC-1 and UC-2 arrived in the parking lot of the Family Dollar.  A short time later, UC-1 observed CARMONA arrive in the parking lot of the

Family Dollar.  Investigators observed him walk into the Family Dollar and exit a short time later.  CARMONA then left the parking lot and walked back in the direction from which he came.  During this time, UC-1 sent several text messages to CARMONA at the Carmona Phone to explain where UC-1 was located.

16.    Approximately five to ten minutes later, CARMONA returned to the Family Dollar parking lot, this time accompanied by another male.  At approximately 2:12 p.m., CARMONA, using the Carmona Phone, sent a text message to UC-1 and stated, "I wear a black coat, enter the family dollar as you are going to buy something and we go there."  UC-1 and UC-2 then observed CARMONA enter the Family Dollar and the other male remain outside.

17.    UC-1 and UC-2 then entered the Family Dollar and located CARMONA.  UC-1 then said, "Pinki."  CARMONA acknowledged.  UC-1 recognized CARMONA as the man who provided UC-1 with the sample of suspected fentanyl on December 2, 2020.  CARMONA was wearing what appeared to be the same black leather jacket he had worn on December 2, 2020.  CARMONA then reached into his jacket pocket and handed UC-1 a clear plastic bag containing 12 individually wrapped fingers of a brown powder substance consistent in appearance with fentanyl.  UC-2 then handed the sham money to CARMONA.  UC-1 and UC-2 then exited the store.

18.    Several minutes later, investigators then observed CARMONA exit the store, meet the other male, and walk away from the premises.  At that point, investigators arrested CARMONA.  On CARMONA's person, they recovered the sham money and two cell phones.

After the arrest, investigators called the number associated with the Carmona Phone and one of the seized phones rang.

19.    The suspected drugs were transported back to a law enforcement facility and logged into evidence.  The drugs were not field tested based on officer safety.  With packaging, they weighed 164 grams.  Based on my training, experience, the price, and physical appearance and packaging of the suspected drugs, I believe them to contain fentanyl and to weigh approximately 120 grams.  The suspected drugs will be sent to the DEA laboratory for testing.

## **CONCLUSION**

20.    Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that CARMONA committed the Charged Offense.  Accordingly, I respectfully request that a criminal complaint and arrest warrant be issued for CARMONA.

Respectfully submitted,

Galen Doud, Special Agent
Drug Enforcement Administration

Sworn to telephonically in accordance with Federal Rule of Criminal Procedure

4.1 on December ___9___, 2020.    9:14 a.m.

Hon. David H. Hennessy
United States Magistrate Judge

7